**Jeff DAVIS**

v.

**ISTHMIAN STEAMSHIP COM-PANY, Appellant.**

No. 12059.

United States Court of Appeals
Third Circuit.

Argued Jan. 25, 1957.

Decided Feb. 15, 1957.

Rehearing Denied March 12, 1957.

T. E. Byrne, Jr., Philadelphia, Pa. (Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellant.

Philip Dorfman, Philadelphia, Pa. (Dorfman & Pechner, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In this Jones Act, 46 U.S.C.A. § 688, suit the main question before us, is

whether there is medical evidence sufficient to support the jury's verdict for aggravation of plaintiff-appellee's pre-existing left hip condition.

On January 7, 1953, Davis, the plaintiff-appellee, working as an oiler aboard the SS Steel Seafarer, struck his left side against the rail of the fire-room ladder. He suffered immediate pain in the region forward of the hip joint. He finished out his watch and stood watch for some days after that. The pain spread about the hip and towards the small of his back. He sought medical treatment at a port where the ship stopped and about the 19th of January was X-rayed at a second port. At that time he was relieved of duty until his return to this country. Shortly thereafter he entered the Marine Hospital at Baltimore where he was a patient until May 22, 1953. Later the consulting surgeons agreed that he should have a fusion operation of his left hip to eliminate pain. That was performed at the Marine Hospital on July 14, 1953.

Davis' same hip had been badly fractured and dislocated in 1940. As a result the head of the femur became aseptically necrosed. That process, according to testimony, was completed within three years of its onset. In 1949 he had unrelated trouble with his left leg. While hospitalized for this in Ceylon his left hip began bothering him. Back in the United States he entered Baltimore Marine Hospital where he was operated on for removal of nerves leading to the hip joint. The purpose of this was to alleviate the pain in that joint. It was considered that by such procedure Davis would be able to return to work. There were actually two denerving operations. The first, an anterior denervation, was performed March 3, 1950. Two pieces of tissue then obtained were examined and the report on these read as follows:

"Gross Pathology: Two pieces of white tissue in formalin, the larger measuring 5 x 3 x 2 mm.
JL:vb

"Microscopic Examination: Specimen has considerable collagen with vascular fatty tissue and 2 or 3 degenerating fragments. No cellular infiltration is seen. No nerve is seen.

"Diagnosis: None offered:"

The second operation, a posterior denervation, took place on March 15, 1950. There is no record of any pathology examination of tissue from this operation. The narrative summary of the patient's further clinical record reads: "Patient was kept at bed rest for 2 weeks. He was then allowed to ambulate; the wound healed per primam; sutures were removed on the 12th postoperative day and patient was given a lift to the left heel. He was discharged on 4–11–50 as not fit for duty. To return to the Outpatient Department for re-examination." Davis was readmitted to the hospital on May 1, 1950 for extensive postoperative therapy and traction to the left leg. He was discharged on May 16, 1950. He returned on the 29th of that month when he was discharged "for work." On August 10, 1950 he went back to the hospital with his left knee sprained due to the inversion of the ankle and heel. According to the hospital record he was "Advised to use $\frac{3}{16}''$ outer lift on the heel for correction. Fit for duty."

In the opinion of Dr. Lippman, a witness for the plaintiff, the latter, following his operations, "had a denervated hip that served satisfactorily and continued to serve for a three year period of time" until, as the doctor said, "On January 7, '53, he had an accident which caused him to have further disability or to have disability in this hip joint. It is felt he has injured adjacent structures about his hip joint and that has been the cause of the future (stet) hospitalization." In Dr. Lippman's judgment "The prior injury had no connection with the pain following the accident (of January 7, 1953); he was pain free up to the time of the accident." Dr. Lippman is chief surgeon and chief of orthopedics of

the Marine Hospital in Baltimore and was so connected when Davis entered there on February 13, 1953. He did not participate in the denerving operations; apparently he was away from the hospital at the time.

Appellant urges that in the above outlined situation there was no case of aggravation of preexisting injury to go to the jury. The theory presented is that the result of the tissue examination compels a conclusion that the hip was not denerved as claimed and therefore the pain or part of it, suffered by Davis and necessitating the fusion procedure, might well have, and probably did, emanate from the old injury directly and not from the structures adjacent to it. It seems to us that this well organized, skillfully argued proposition goes to the credibility of the evidence and was for the jury to consider.

At the outset it is noted that only tissue from the first operation was examined. There is no evidence that such procedure was followed in the posterior denervation; no reference regarding it. We do not see that this of itself destroys appellant's contention. It can still be suggested that since no nerve was seen in the tissue obtained from the anterior denervation the nerves in that area were not sectioned and removed as intended. The conclusion offered would be of course that a source of pain, unconnected with the accident sued on, remained in the hip joint.

Dr. Lippman was cross-examined regarding the significance of the notation "No nerve is seen". He said, "It doesn't mean anything other than the fact they had couple of pieces of tissue that was (stet) sent over to the pathology lab and they were not diagnostic of any particular substance or disease." He vigorously denied that the note meant that "the nerve or any portion of it" was not removed. He said "The two pieces that were sent over there (to the pathology laboratory) were not nerve tissues * * * But I have every reason to believe that Dr. Davies denervated the hip

and did sever the obturator nerve as he said."

In addition to Dr. Lippman there was the affirmative testimony of the operating surgeon Dr. Davies who described with particularity the denervation he performed of plaintiff's left hip. Regarding the first operation he said "* * * we removed all visible evidence of nerve tissue going to the front of the hip joint." With reference to the posterior operation he said in part "Thus the back of the hip joint was now completely exposed. A nerve fiber was then picked up coming from the deep surface of the quadratus femoris and extending upwards and medial wards toward the sciatic nerve. This nerve was sectioned. However, it was not felt that this was the entire nerve supply. Thus the posterior capsule was excised and several long incisions were made partially through the capsule of the hip joint in order to destroy any further innervation. The insertion of the gluteus maximus was then repaired. The next is closing the skin."

Dr. Bell, a witness on behalf of the defendant gave some support to the assertion that the hip had been denerved when he said, "He (Davis) had the longest relief from a nerve operation of any case I have ever seen." Dr. Michele, also called by the defense, testified that as a result of the operations "I believe the major nerve to the hip joint was destroyed." He explained the recurrence of pain by attributing it to "Regeneration of nerve supply."

As has been stated Davis was discharged from the hospital following the denerving operations on May 16, 1950. He returned to work the 30th of that month and worked steadily thereafter until his accident of January 7, 1953. His work record was better than the average seaman. In the course of his job in the engine room he had to climb several flights of stairs up and down. Dr. Davies testified that he followed plaintiff's case for thirteen months after the surgery and during that time Davis did

not "* * * offer any complaints of pain * * *." In the doctor's opinion Davis would have been able to continue indefinitely without pain. The doctor did not think it possible that the pain after the accident of January 7, 1953 arose as a result of the conditions existent in the hip prior to his surgery. This was especially so he said in view of the sudden onset of the pain which in his judgment "* * * could come from any of the structures about the hip joint. * * * Ligaments, muscles, tendons, bursa."

All of the above evidence was before the jury whose task it was to evaluate that evidence in deciding whether the January 7, 1953 accident had aggravated plaintiff's preexisting hip condition.

As its second point appellant complains of what it describes as the inadequacy of the court's charge. To a major extent the type of charge given was caused by the large number of requests from both sides, most of them on fundamental principles. The trial judge did give general instructions to the jury explaining that he would not elaborate further in the charge proper because he intended reading the requests, which he did.

Confronted by the number and kind of requests submitted the judge had a problem of sorts. He could have and should have instructed in his main charge on the basic issues involved in the points presented, denying the requests embraced therein except as charged. However, deciding to charge the parties' acceptable requests, he chose to forego repeating them in his charge in chief. The fault, such as it was, was that of both court and counsel. It was not substantial.

The judgment of the district court will be affirmed.